**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAPANESE VILLAGE, LLC, a
California Limited Liability
Company,

*Plaintiff-Appellant*,

v.

FEDERAL TRANSIT
ADMINISTRATION; CAROLYN
FLOWERS, in her official capacity as
Acting Administrator of the Federal
Transit Administration; LESLIE T.
ROGERS, in his official capacity as
Regional Administrator of the
Region IX Office of the Federal
Transit Administration; U.S.
DEPARTMENT OF TRANSPORTATION;
ANTHONY FOXX, in his official
capacity as Secretary of the U.S.
Department of Transportation; LOS
ANGELES METROPOLITAN
TRANSPORTATION AUTHORITY, a
California-chartered Regional
Transportation Planning Agency,

*Defendants-Appellees.*

No. 14-56837

D.C. No.
2:13-cv-00396-
JAK-PLA

OPINION

| | |
|---|---|
| TODAY'S IV, INC., DBA Westin Bonaventure Hotel and Suites, a California Corporation, *Plaintiff-Appellant*, <br><br> v. <br><br> FEDERAL TRANSIT ADMINISTRATION; CAROLYN FLOWERS, in her official capacity as administrator of the Federal Transit Administrator; LESLIE T. ROGERS, in his official capacity as Regional Administrator of the Federal Transit Administrations Region IX Office; UNITED STATES DEPARTMENT OF TRANSPORTATION; ANTHONY FOXX, in his official capacity as Secretary of the United States Department of Transportation; LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, a public entity; ARTHUR T. LEAHY, in his official capacity as Chief Executive Officer of the Los Angeles County Metropolitan Transportation Authority, *Defendants-Appellees.* | No. 14-56973 <br><br> D.C. No. 2:13-cv-00378-JAK-PLA |

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted August 1, 2016
Pasadena, California

Filed December 6, 2016

Before: Stephen Reinhardt and Kim McLane Wardlaw,
Circuit Judges, and Ronald M. Whyte,[*] District Judge.

Opinion by Judge Whyte

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of federal and local transit agencies and officials (appellees) on claims under the National Environmental Policy Act brought by Japanese Village, LLC and Westin Bonaventure Hotel alleging that appellees' environmental impact analysis for a new underground light rail line project in downtown Los Angeles was inadequate.

Japanese Village and Bonaventure own real property near the rail line project.

---

[*] The Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a preliminary matter, the panel declined to take judicial notice of three documents on the Los Angeles Metropolitan Transportation Authority website because the documents were already in the appellate record. The panel also declined to consider Japanese Village's argument, that the Mitigation Monitoring and Reporting Program was not properly attached to the federal Record of Decision, because Japanese Village failed to present the argument to the district court.

The panel rejected Japanese Village's challenges to the adequacy of the mitigation plan included with the Final Environmental Impact Statement issued in January 2012. Specifically, the panel held that appellees analyzed and adopted additional mitigation measures for construction-related noises and vibration in Japanese Village after the release of the Final Environmental Impact Statement, and the failure to see the need for these mitigation measures at the time the impact statement was released in January 2012 did not violate NEPA. The panel further held that regardless of whether temporary relocation was considered a mitigation measure or a source of harm, appellees did not violate NEPA as long as they took a hard look at each alternative and discussed the extent to which adverse effects could be avoided. The panel also held that appellees did not violate NEPA by not specifically requiring "isolated slab track" technology to mitigate operational noise and vibration from trains passing below Japanese Village. The panel also held that appellees' plan to mitigate potential building subsidence due to tunneling under Japanese Village was not arbitrary and capricious, an abuse of discretion, or otherwise in violation of law. Finally, the panel concluded that appellees' analysis of off-street parking impacts was sufficient to pass muster under NEPA.

Addressing Bonaventure Hotel's arguments, the panel held that appellees were not arbitrary or capricious in finding that Closed-Face Tunnel Boring Machine construction was not a feasible alternative as a tunneling method for the Lower Flower portion of the Project. The panel also rejected Bonaventure's challenges to the sufficiency of the project impact and mitigation analysis in the Final Environmental Impact Statement. Finally, the panel held that no supplemental Environmental Impact Statement was required, and rejected Bonaventure's claim that appellees were required to prepare a supplemental statement because Los Angeles Metro applied for noise ordinance variances to accommodate nighttime construction on Lower Flower after the issuance of the Final Environmental Impact Statement.

## COUNSEL

Robert D. Crockett (argued), Courtney Vandreuil, and Chase Tajima, Crockett & Associates, Santa Clarita, California, for Plaintiff-Appellant Japanese Village, LLC.

Christopher Sutton (argued), Law Office of Christopher Sutton, Pasadena, California; Robert P. Silverstein and Bradly S. Torgan, The Silverstein Law Firm APC, Pasadena, California, for Plaintiff-Appellant Today's IV, Inc.

Erika B. Kranz (argued), J. David. Gunter, and Jared Pattinato, II, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for Federal Defendants-Appellees.

Whitman F. Manley and Tiffany K. Wright, Remy Moose Manley LLP, Sacramento, California; Mark J. Saladino, Coujnty Counsel; Charles M. Safer, Assistant County Counsel; Ronald W. Stamm, Principal Deputy County Counsel; Los Angeles County Counsel, Los Angeles, California; for Defendant-Appellee Los Angeles County Metropolitan Transportation Authority.

## OPINION

WHYTE, District Judge:

Appellants Japanese Village, LLC and Today's IV, Inc. dba Westin Bonaventure Hotel ("Bonaventure") appeal from the district court's grant of summary judgment in favor of Appellees on Appellants' claims under the National Environmental Policy Act, 42 U.S.C. § 4321 ("NEPA"). Appellants argue that Appellees'[1] environmental impact analysis for a new underground light rail line project in downtown Los Angeles was inadequate. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Metro plans to construct the Regional Connector Transit Corridor Project ("the Project"), a 1.9-mile light rail extension line in downtown Los Angeles, with federal

---

[1] The Appellees are: the Federal Transit Administration ("FTA"); Peter Rogoff, the Administrator of the FTA; Leslie Rogers, the Regional Administrator of the Region IX Office of the FTA; the U.S. Department of Transportation; Ray LaHood, the Secretary of the U.S. Department of Transportation; and the Los Angeles Metropolitan Transportation Authority ("Metro").

funding from the Federal Transit Administration. The Project is intended to meet increased demand for public transit and improve transit service in the region by connecting the light rail Gold Line to the Blue and Expo Lines. The route for the extension line begins at 7th and Flower Streets and travels north on Flower Street to 2nd Street. It then continues east on 2nd Street to Central Avenue, where it turns north to intersect the Gold Line at 1st and Alameda Streets as shown below:



Appellants Japanese Village and Bonaventure own real property near the Project. The Japanese Village Plaza is a shopping center and office complex in the Little Tokyo area at the eastern end of the proposed line, and the Westin Bonaventure Hotel occupies the block bounded by Flower, 4th, 5th, and Figueroa Streets in the Financial District.

## A.  NEPA Requirements

The National Environmental Policy Act requires a federal agency to prepare an Environmental Impact Statement ("EIS") for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA applies to state transportation projects with significant federal funding. *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1101 (9th Cir. 2007). The EIS must include a detailed statement regarding, *inter alia*: (i) "the environmental impact of the proposed action"; (ii) "any adverse environmental effects which cannot be avoided should the proposal be implemented"; and (iii) "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C). Once an agency determines that an EIS is required, it must prepare a draft EIS ("DEIS"). *See* 40 C.F.R. § 1502.9(a). The agency then releases the DEIS to the public and other agencies for comment. *Id.* § 1503.1(a). After the public comment period, the agency prepares a final EIS ("FEIS"), in which it must respond to comments made during the DEIS comment period. *Id.* § 1502.9(b). After the FEIS is released, the agency has the option to request comments before making a final decision. *Id.* § 1503.1(b).

If the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," then the agency must prepare a supplemental DEIS or FEIS. *Id.* § 1502.9(c).

The agency ultimately produces a record of decision ("ROD") that explains the rationale for agency's decision. *Id.* § 1505.2. The ROD must include an assessment of all

practicable measures for mitigating environmental harm. *See id.* § 1505.2(c).

## B. Draft Environmental Impact Statement

In the instant case, the FTA published a Draft Environmental Impact Statement for public comment in September 2010. Metro had initially identified two build alternatives for the Project: a light rail primarily operating above ground (the "At-Grade Emphasis Alternative") and a light rail that was primarily underground (the "Underground Emphasis Alternative").[2] During the DEIS drafting process, Appellees established a Little Tokyo Working Group, made up of leaders of the Little Tokyo Community Council and Metro staff, to discuss the impact of the Project on the community. The Little Tokyo community had concerns about the negative construction and operation impacts of both the At-Grade Emphasis Alternative and the Underground Emphasis Alternative. To address these concerns, the Little Tokyo Working Group collaborated on the development of the "Fully Underground Alternative," which Metro staff recommended in the DEIS. After the period for public comment on the DEIS, Metro's Board of Directors voted to designate the Fully Underground Alternative as the Locally Preferred Alternative.

---

[2] In total, the DEIS discusses five alternatives: (i) the required "No Build Alternative"; (ii) rapid bus lines between the stations (the "Transportation System Management Alternative"); (iii) the "At-Grade Emphasis Alternative"; (iv) the "Underground Emphasis Alternative"; (v) and the "Fully Underground Alternative."

## C. Supplemental Environmental Assessment

Appellees continued to refine the Locally Preferred Alternative and addressed the impact of the refinements in a Supplemental Environmental Assessment/Recirculated Sections of the DEIS ("SEA") released in July 2011. The refinements included reductions in the use of "cut and cover construction" for tunnel excavation, replaced by the use of "Tunnel Boring Machine" or "TBM" excavation.

Cut and cover construction entails excavating down from the ground surface using temporary excavation support to stabilize the ground before excavation begins. Temporary concrete decking is placed over the "cut" to allow traffic to pass above during construction; once the tunnel is complete, the excavated trench area is backfilled and the temporary decking is replaced by permanent surface. A tunnel-boring machine is a large-diameter horizontal drill that is used to excavate circular tunnel sections. Compared to the cut and cover method, tunnel boring is far less disruptive to surface traffic and adjacent land uses.

The Project refinements addressed in the SEA extended the use of TBM south along Flower Street from 2nd Street to 4th Street. The Project route was also realigned to eliminate the use of cut and cover construction on 2nd Street in Little Tokyo in favor of Closed Face TBM construction. The new route required Metro to purchase an easement for tunneling below the Japanese Village shopping center and office complex. The period for public comment on the SEA closed on September 6, 2011.

### D.  Final Environmental Impact Statement and Record of Decision

On January 20, 2012, Appellees issued a Final Environmental Impact Statement and included responses to the public comments on the SEA. Appellees then accepted additional public comment on the FEIS and conducted a series of meetings with community stakeholders between February and April 2012. These efforts resulted in Metro staff recommending that the use of Closed-Face TBM be extended even farther south along Flower Street from 4th Street to 5th Street, budget permitting. Metro also conducted additional analysis of the extent to which mitigation measures could reduce noise and vibration in Japanese Village. In advance of the meeting to approve the Project, Metro staff recommended that the Board adopt additional mitigation measures for Japanese Village.

On April 26, 2012, the Metro Board adopted the staff's recommendations and voted to approve the project. The FTA issued its Record of Decision approving federal funding for the Project on June 29, 2012. The ROD includes a mitigation monitoring and report plan ("MMRP") as Attachment A.

### E.  District Court's Decision, Final Supplemental Environmental Impact Statement, and Supplemental Record of Decision

Japanese Village, Bonaventure, and a third plaintiff filed complaints challenging Appellees' NEPA compliance in January 2013. The parties brought cross-motions for summary judgment. The district court granted summary judgment in favor of Appellees on all claims except for one claim on which Bonaventure prevailed. Japanese Village and

Bonaventure timely appealed several aspects of the district court's summary judgment ruling in favor of Appellees.

In December 2015, during the pendency of these appeals, Appellees published a Final Supplemental Environmental Impact Statement ("FSEIS") and Supplemental Record of Decision. Appellees prepared the FSEIS because the district court had entered an injunction in connection with the one claim on which Bonaventure prevailed, requiring FTA and Metro to adequately analyze the open-face tunneling alternatives on Lower Flower before beginning cut and cover construction in that area.[3] In addition to the analysis required by the district court, the FSEIS included discussion of Closed-Face TBM on Lower Flower and expressly adopted the additional mitigation measures for Japanese Village.

## II.  STANDARD OF REVIEW

We review the district court's summary judgment ruling de novo. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the Administrative Procedure Act, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be

---

[3] The district found that the FSEIS adequately addressed the open-face tunneling alternatives on Lower Flower and dissolved the injunction on February 5, 2016.

searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99 (1977)).

## III.  *JAPANESE VILLAGE CLAIMS*

Japanese Village argues that the FTA failed to comply with NEPA's procedural requirements for creating a Record of Decision because the ROD in this case incorporates mitigation measures by reference. More significantly, Japanese Village argues that the FEIS does not include adequate analysis and mitigation discussion of: (1) construction-related noise and vibration impacts; (2) long-term, operational noise and vibration impacts; (3) subsidence risk; and (4) parking impacts. We address these arguments in turn.

### A.  *Judicial Notice of Material on Metro Website*

As a preliminary matter, Japanese Village requests that we take judicial notice of three documents on Metro's website: (1) a copy of the federal ROD in this case; (2) "Attachment A: Mitigation Monitoring and Reporting Program" (or "MMRP"); and (3) a web page containing links to these two documents. Japanese Village offers these documents to show that Appellees' "official" MMRP on the website matches one of the several versions of the MMRPs in the appellate record. Appellees argue that judicial notice is unnecessary because the FTA's Region IX Administrator submitted a declaration identifying the correct versions of the ROD and its Attachments in the existing record. The

declarant confirmed that these documents are the same ones on Metro's website.

Judicial notice might ordinarily be appropriate for the documents on Metro's website because the documents were "made publicly available by government entities . . . and neither party disputes the authenticity of the web site[] or the accuracy of the information displayed therein." *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (citing Fed. R. Evid. 201). The parties at least agree that the website contains the "official" copies of the ROD and its attachments. In this case, however, it appears that the Court need not rely on the Metro website because the documents for which Japanese Village seeks judicial notice are already in the appellate record. Accordingly, we decline to take judicial notice of the three documents on Metro's website.

## B.  Adequacy of the Record of Decision's Assembly

An ROD must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation." 40 C.F.R. § 1505.2(c). Japanese Village argues that the ROD in this case fails to summarize Appellees' monitoring and enforcement program as required, apparently because the ROD references an "Attachment A: Mitigation Monitoring and Reporting Program," but the MMRP is not directly "attached" to the ROD. Rather, there is a gap in the page numbering before the MMRP appears in the administrative record, and, as noted above, the MMRP is in a separate electronic file from the ROD on Metro's website.

Appellees argue that Japanese Village waived any argument that the FTA improperly assembled the ROD because Japanese Village failed to present this argument to the district court. "Absent exceptional circumstances," we "generally will not consider arguments raised for the first time on appeal," although we have discretion to do so. *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). The Court "may exercise this discretion (1) to prevent a miscarriage of justice; (2) when a change in law raises a new issue while an appeal is pending; and (3) when the issue is purely one of law." *Id.* Japanese Village acknowledges in reply that it did not raise the issue of an ROD assembly defect with the district court. Moreover, Japanese Village does not argue that any exceptional circumstances require us to consider its assembly defect arguments. Accordingly, we decline to consider Japanese Village's argument that the MMRP was not properly attached to the ROD.

## C. Adequacy of Environmental Impact Statement

Japanese Village challenges the adequacy of the mitigation plan included with the FEIS that issued in January 2012. An EIS, which chronologically precedes an ROD, must include a discussion of possible steps to mitigate environmental harm. The U.S. Supreme Court has described the mitigation requirement as follows:

> [O]ne important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences. The requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the Act and, more expressly, from CEQ's implementing

regulations. Implicit in NEPA's demand that an agency prepare a detailed statement on "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(C)(ii), is an understanding that the EIS will discuss the extent to which adverse effects can be avoided.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989) (citation omitted). As the Supreme Court and Ninth Circuit have acknowledged, NEPA "does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350 (explaining that "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"); *Conner v. Burford*, 848 F.2d 1441, 1450 (9th Cir. 1988) (clarifying that "NEPA does not require that mitigation measures *completely* compensate for the adverse environmental effects").

Japanese Village takes issue with four aspects of Appellees' mitigation plan, described below.

### 1. Construction-Related Noise and Vibration

Japanese Village first argues that Appellees have not adequately addressed noise and vibration from construction of tunnels under the Japanese Village property. As described above, the FEIS was issued in January 2012. The FEIS noted that during operation of the tunnel-boring machine, certain portions of Japanese Village could sometimes experience ground-borne vibration (GBV) of 86 VdB and ground-borne

noise (GBN) of approximately 51 dBA.[4] Japanese Village businesses fall into a category of land use for which the federal annoyance criteria for infrequent vibration and noise are 83 VdB and 48 dbA, respectively. *Id.* Thus, the FEIS recognized that without some mitigation, construction could cause significant impact to Japanese Village. The FEIS described several mitigation measures, numbered with the prefix "NV-," that could reduce noise and vibration at various construction locations. The measures include proper "maintenance and operation" of equipment and use of a "resilient mat" for delivery trains, among others. The FEIS also provided that "Metro shall monitor GBN and GBV levels in the in the [sic] building adjacent to TBM activity during its operation in that area" and that "[d]uring the few days the TBM will be operating in this area, should GBN or GBV measurements exceed FTA annoyance criteria for short-term impacts during construction, Metro shall offer to temporarily relocate affected residents."

During the comment period for the FEIS, Japanese Village told Metro that the proposed noise and vibration mitigation measures described in the FEIS were inadequate. Specifically, Japanese Village argued that particular mitigation measures adopted for other construction locations, including NV-19, NV-21, NV-22, NV-23, and NV-27, should also apply to Japanese Village.

Between the time the FEIS was issued and the time Metro approved the Project on April 26, 2012, Metro conducted additional analysis, and its experts estimated the extent to which additional mitigation measures could reduce noise and

---

[4] VdB is a measure of vibration in decibels. dBA is a measure of noise in decibels.

vibration in Japanese Village. In advance of the meeting to approve the Project, Metro recommended that additional mitigation measures be adopted for Japanese Village, including NV-19 (maintaining machinery); NV-21 (speed of delivery trains); NV-22 (resilient mat); NV-23 (conveyor); NV-27 (resiliently supported fasteners); and TR-1 (traffic management). Ultimately, Metro approved the Project on April 26, 2012, and the FTA issued its ROD, including the MMRP described above, in June 2012.

On appeal, Japanese Village argues that Metro ignored the advice of its experts because Metro did not actually vote to approve the additional mitigation measures. Japanese Village also argues that as a matter of law, relocation cannot be used as a mitigation measure.

### a. Whether Metro Adopted Mitigation Measures

Relying primarily on a transcript of Metro's April 26, 2012 board meeting, Japanese Village argues that Metro's board voted to defer all mitigation measures rather than adopt the additional measures its expert had recommended. We find Japanese Village's argument unpersuasive despite the lack of clarity in the April 26, 2012 transcript, which contains several references to "unintelligible" comments. Nevertheless, the transcript indicates that the board voted to approve "Item A through D as amended." The board's meeting minutes clarify that "Item D" referred to utilizing additional noise and vibration mitigation measures (NV-19, NV-21, NV-22, NV-23, and NV-27, defined above) at Japanese Village. Moreover, Attachment B to the ROD, "Summary of Comments and Responses to Comments on the Final EIS," explicitly states: "Mitigation measures NV-19, NV-21, NV-22, NV[-]23, NV-27, and TR-1 specifically apply to the

Japanese Village Plaza." Japanese Village correctly points out that a May 14, 2012 summary of the results of the board's April 26, 2012 action omits reference to the fact that measures NV-19 and NV-27 apply to Japanese Village. However, Appellees explain that this was simply a drafting error.

If there were any doubt that Metro formally adopted the proposed mitigation measures, those doubts were resolved on December 15, 2015 when the FTA and Metro issued a Final Supplemental Environmental Impact Statement. While the primary goal of the FSEIS was to further analyze use of a tunnel-boring machine along Lower Flower Street as ordered by the district court, the FSEIS also corrects the earlier drafting error and explicitly specifies that mitigation measures NV-19, NV-21, NV-22, NV-23, and NV-27 apply to Japanese Village. Japanese Village's argument that Metro has not adopted the corrected mitigation plan from 2015 is unpersuasive because, as explained above, the most reasonable reading of the record indicates that Metro adopted the relevant mitigation measures even in 2012.

We also find unpersuasive Japanese Village's argument that Appellees failed adequately to analyze the effectiveness of proposed mitigation alternatives. The March 28, 2012 expert study that Japanese Village asserts was overlooked by Appellees estimates the reduction in noise and vibration that proposed mitigation measures would provide.

In sum, we find that Appellees analyzed and adopted additional mitigation measures for construction-related noise and vibration in Japanese Village after the release of the FEIS, and Appellees documented these measures in the June 2012 ROD. We conclude that the failure to see the need for

these mitigation measures at the time the FEIS was released in January 2012, as evidenced by the fact that these measures were analyzed and adopted later, did not violate NEPA.

### b. Whether Relocation is a Permissible Mitigation Measure

Notwithstanding the fact that Metro adopted measures to mitigate construction-related noise and vibration, the parties appear to agree that construction-related noise and vibration may at least temporarily exceed federal standards in parts of Japanese Village. Thus, it is quite possible that Appellees' planned mitigation step of assisting residents and businesses with temporary relocation will be necessary. Japanese Village argues that relocation does not constitute mitigation as a matter of law.

Japanese Village and Appellees both rely on the text of the relevant NEPA regulation, which states:

> Mitigation includes:
>
> (a) Avoiding the impact altogether by not taking a certain action or parts of an action.
>
> (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
>
> (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20. Japanese Village argues that this list is exclusive and that since relocation does not appear in 40 C.F.R. § 1508.20, it is not a valid mitigation measure. Appellees argue that relocation could fall under subdivision (e) of the regulation because relocation "provid[es] substitute . . . environments" for displaced residents. Moreover, Appellees argue, the regulation merely defines what mitigation "includes." Appellees argue that the regulation permits mitigation measures that are not specifically enumerated in the text.

The cases cited by Japanese Village do not directly address whether relocation is a valid mitigation measure under 40 C.F.R. § 1508.20 or NEPA generally. For example, *In re Katrina Canal Breaches Consolidated Litigation*, No. 05-4192, 2011 WL 651946, at *4 (E.D. La. Feb. 11, 2011) merely noted in dicta that one of the goals of a project was to "avoid and minimize relocations and other impacts to local residents and businesses to the maximum extent practicable." As Japanese Village notes, *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178 (8th Cir. 2001) dealt with the relocation of airplanes, not people. *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Commission*, 869 F.2d 719 (3d Cir. 1989), also cited by Japanese Village, simply noted that agencies should consider socioeconomic impacts of federal projects, including the impact of relocation. Finally,

the district court in *Monarch Chemical Works, Inc. v. Exon*, 452 F. Supp. 493, 500 (D. Neb. 1978) ruled that a project required an EIS in part because of "the environmental consequences of the relocation of an entire community." None of these cases addresses the definition of "mitigation."

Japanese Village also argues that in cases in which relocation is necessary, the government must comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the "Relocation Act"), 42 U.S.C. §§ 4601 et seq. Japanese Village correctly points out that courts have enjoined federal projects that fail to comply with the Relocation Act. In a notice of errata filed after Japanese Village filed its reply brief, however, Japanese Village acknowledges that the EIS in the instant case actually does consider the Relocation Act. For example, a page of the Mitigation Monitoring and Reporting Program indicates that "Metro shall provide relocation assistance and compensation as required by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970." Japanese Village does not claim that Appellees have violated the Relocation Act, so any argument that the Project could be enjoined on that basis does not apply.

Ultimately, we need not decide whether relocation can ever be a valid mitigation measure under NEPA because "NEPA does not require that mitigation measures *completely* compensate for the adverse environmental effects." *Conner*, 848 F.2d at 1450. The Supreme Court's example in *Robertson* is instructive:

> [I]t would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the

> benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd.

*Robertson*, 490 U.S. at 351. In the instant case, regardless of whether relocation is considered a mitigation measure or a source of harm, Appellees would not have violated NEPA as long as they took a hard look at each alternative and discussed the extent to which adverse effects can be avoided. Not only did Appellees examine various noise and vibration mitigation measures, Appellees also went beyond NEPA's procedural requirements and committed to implementing the mitigation measures that Japanese Village requested.

### 2. *Operational Noise and Vibration*

Japanese Village next argues that Appellees violated NEPA by not specifically requiring "isolated slab track" technology ("IST") to mitigate operational noise and vibration from trains passing below Japanese Village. For so-called "Category 3" land uses such as the offices at Japanese Village Plaza, federal vibration and noise guidelines for "frequent" events such as a single train passing beneath are 75 VdB and 40 dBA respectively.[5] The vibration and noise guidelines for "occasional" events such as two trains passing at once are 78 VdB and 43 dBA. *Id.* In a March 2011 report, Appellees' engineers found that without mitigation, operational noise (but not vibration) could exceed these levels.

---

[5] "Category 3" land uses include "quiet office or institutional buildings," while "Category 2" land uses include residential buildings.

To address operational noise and vibration, in the January 2012 FEIS, Appellees' mitigation plan included the following measures:

> In the vicinity of the Hikari Lofts and Nakamura Tetsujiro Building, Metro shall conduct engineering studies during final design to verify initial estimates of GBN and shall implement high compliance resilient fasteners, floating slab trackbed, or other appropriate measures as needed to eliminate impacts and to reduce GBN below FTA annoyance criteria. (NV-28)

> In the vicinity of the offices at JVP and the Broad Art Foundation Museum, currently under construction, Metro shall conduct engineering studies during final design to verify initial estimates of GBN and shall implement high compliance resilient fasteners or other appropriate measures as needed to eliminate impacts and reduce GBN below FTA annoyance criteria. (NV-29)

At the time of the FEIS, Appellees did not expect that IST would be necessary.

As with the construction-related noise and vibration analysis, however, an engineering report issued after the FEIS suggested that without IST, the noise levels at Japanese Village Plaza would exceed federal limits. Japanese Village argues that it was an abuse of discretion for the FTA to "ignore the most recent and reasoned reports from its experts"

and allow the use of mitigation means other than IST without an appropriate explanation.

Japanese Village's argument is unpersuasive for two reasons. First, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373. In this case, the January 2012 FEIS accounted for the possibility that "other appropriate measures" could be taken "as needed to eliminate impacts and reduce GBN below FTA annoyance criteria." Second, as with the mitigation measures Japanese Village requested to reduce construction-related noise and vibration, Appellees specifically adopted IST for Japanese Village when the Metro board approved the Project on April 26, 2012. The meeting minutes reflect: "NV-27 – In the vicinity of the . . . Japanese Village Plaza . . . Metro shall use resiliently supported fasteners, isolated slab track technology, or other appropriate measures as needed to eliminate impacts and to reduce GBN below FTA annoyance criteria." Attachment B to the ROD states: "Mitigation measures NV-19, NV-21, NV-22, NV[-]23, NV-27, and TR-1 specifically apply to the Japanese Village Plaza." Moreover, the December 15, 2015 Final Supplemental Environmental Impact Statement explicitly states that mitigation measure NV-27, which includes IST, applies to Japanese Village. Accordingly, to the extent that Japanese Village complains about a lack of implementation of IST (as opposed to a lack of discussion in the FEIS), Japanese Village's argument is now moot.

### 3. Subsidence

Japanese Village argues that Appellees' plan to mitigate potential building subsidence due to tunneling under Japanese Village is not sufficiently detailed. Specifically, Japanese

Village argues that the FEIS should have explicitly required that a 0.25 inch settlement in any building would trigger the use of compensation grouting.

An EIS must "discuss mitigation measures, with sufficient detail to ensure that environmental consequences have been fairly evaluated." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (per curiam) (citation omitted) (internal quotation marks omitted). In *South Fork Band*, we found an EIS inadequate where it stated that "[f]easibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan," but the EIS omitted any discussion of "whether the anticipated harms could be avoided by *any* of the listed mitigation measures." *Id.* Japanese Village argues that Appellees' MMRP improperly defers analysis in favor of future studies and site-specific investigation.

In the instant case, the MMRP includes three pages of measures designed to combat building subsidence. One of the measures included in the MMRP states, in relevant part:

> GT-1: While engineering designs are being finalized, but before any construction, a survey of structures within the anticipated zone of construction influence shall be conducted in order to establish baseline conditions. . . . If assessments indicate the necessity to proactively protect nearby structures, additional support for the structures by underpinning or other ground improvement techniques shall be required prior to the underground construction. Metro

shall require the construction contractor to limit movement to less than acceptable threshold values for vertical, horizontal, and angular deformation as a performance standard. These acceptable threshold values shall be established such that the risk of damage to buildings and utilities will be negligible to very slight. For buildings, these threshold values will be based on the relationship of building damage to angular distortion and horizontal strain consistent with Boscardin and Cording (1989) and qualitative factors including but not limited to the type of structure and its existing condition. . . . Additional data and survey information shall be gathered during final design for each building and utility main to enable assessment of the tolerance of potentially affected structures and utilities.

Another mitigation measure in the MMRP states:

GT-2: Ground improvement such as grouting or other methods shall be required to fill voids where appropriate and offset potential settlement when excess material has been removed during excavation. The criteria for implementing grouting or ground improvement measures shall be based on the analysis described in mitigation measure GT-1.[6]

---

[6] The MMRP also proposes additional mitigation measures labeled GT-3 through GT-6.

These mitigation measures are not specific to Japanese Village, and Japanese Village argues that the lack of specificity does not allow for adequate evaluation of the measures' impact.

While, at first glance, these mitigation measures seem to lack detail, the manner in which Appellees worked to develop the measures shows that Appellees sufficiently considered the effectiveness of each proposal. After the FEIS was issued but before the ROD was signed, Metro asked an expert to assess the potential effects of underground construction on existing Japanese Village buildings. The expert concluded that without mitigation, three buildings in Japanese Village were anticipated to have "moderate" to "very severe" damage due to subsidence. The expert recommended that as "soon as buildings show a settlement value approaching 0.25 inches, compensation grouting would be activated under the building in order to counteract tunneling settlement developing under it." The expert opined:

> With the successful implementation of compensation grouting, the settlement under these buildings could be controlled to acceptable levels. At the present level of analysis, which is empirical settlement will have to be limited to 0.25 inches for "Negligible" damage, or 0.5 in. for "Slight" damage, which by definition in practice non-structural and cosmetically repairable.

This expert study, issued on April 9, 2012, was part of the administrative record when Appellees issued their ROD in on June 29, 2012. Unlike the EIS rejected in *South Fork Band*, Appellees' proposed mitigation measures, when viewed in

light of the analysis provided by Appellees' expert, are sufficient to allow for an evaluation of effectiveness. Thus, we agree with the district court that Appellees' analysis satisfies the purpose of NEPA, "to ensure that agencies carefully consider information about significant environmental impacts." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011).

Our conclusion is also consistent with that of a recent case cited in Japanese Village's notice of supplemental authority. In *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016), we approved an EIS that included, among other things, an "adaptive management plan" that "provide[d] flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." While a mere promise to develop site-specific mitigation measures in the future might not pass muster, "the use of such a continuous monitoring system may complement other mitigation measures, and help to refine and improve the implementation of those measures as the Project progresses." *Id.*

For the reasons set forth above, we conclude that Appellees' plan to mitigate subsidence was not arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law.

### 4. Parking

Finally, Japanese Village argues that Appellees failed to adequately consider the increased demand that the new Little Tokyo transit station will place on Japanese Village's existing parking structure. Because the new transit station will not provide additional parking and will be located only 16 feet

from Japanese Village's parking structure, Japanese Village worries that the parking used by its employees and customers will be overrun by rail commuters. While Japanese Village acknowledges that Appellees conducted parking studies, it argues that Appellees' analysis of the impact on Japanese Village's parking structure—as opposed to other off-street and on-street parking—was insufficient.

Appellees rely on several portions of the record to support their argument that Appellees' parking analysis was adequate. For example, Appellees point out that they created a 160-page transportation analysis study, which included extensive discussion about the impact on parking. Appellees also cite the Station Planning Toolkit, attached as Appendix J to the FEIS, which notes that 600 additional parking spaces are expected in Little Tokyo as part of a new mixed-use development. The portion of Appellees' analysis that seems most directly responsive to Japanese Village's concern about off-street parking is in a paragraph in Chapter 4 of the FEIS:

> Typically, privately-operated parking lots are considered *transitional land uses* that could be developed by the owners for higher and better uses. Several other privately-operated parking lots and structures are located in the vicinity. Loss of the current parking lot may cause an inconvenience for users but it would not represent a significant impact. *Parking demand in the area would be partially offset by the increased public transit access provided by the proposed project.* However, Little Tokyo residents and business owners have indicated that parking spaces are important community resources and that the

loss of this parking could negatively impact the adjacent small businesses and the JANM located across the street. The community is concerned that this could, in turn, affect the economic stability and ultimately the character of the community. Therefore, *prior to construction of the alternative, Metro would conduct an annual parking capacity study of the Little Tokyo area during construction to determine if there is sufficient parking availability without these parcels. Metro would also make a portion of the Mangrove property available for valet parking to offset the parking loss.* This change would not be a significant impact with respect to displacements.

Another portion of the FEIS notes the "[p]ermanent displacement of approximately 270 off-street parking spaces" due to the Project, approximately 130 of which are in Little Tokyo. Among other things, Appellees argue that because surface parking is a "transitional land use," long-term parking availability may decline even in the absence of the Project.

There are no NEPA thresholds for determining the significance of parking impacts, and Japanese Village has not cited any cases in which a court has found an EIS inadequate for failure to consider increased demand on an existing parking structure. The two district court cases on which Japanese Village relies arguably support Appellees' position that their analysis was adequate. Japanese Village criticizes Appellees for "philosophiz[ing]" that improved transit service may reduce the need for parking. However, in *California Coastal Commission v. U.S. Department of the Navy*, 22 F.

Supp. 3d 1081, 1103 (S.D. Cal. 2014), which Japanese Village cites, the court noted that "increased public transportation in the downtown areas" may reduce demand for parking. Moreover, the court found the Navy's parking analysis sufficient even though the Navy found that the parking impact of the project at issue "may be unmitigable."[7] *Id.* In *Crenshaw Subway Coalition v. Los Angeles County Metropolitan Transportation Authority*, No. CV 11-9603 FMO (JCx), 2015 WL 6150847, at *26 (C.D. Cal. Sept. 23, 2015), the court affirmed an agency determination, based on a parking survey, that a light rail project "will not result in a significant impact because the combination of both on- and off-street parking provides enough total parking spaces to meet the demand in the area."[8] Here, as noted above, Metro plans to "conduct an annual parking capacity study of the Little Tokyo area during construction to determine if there is sufficient parking availability."

The only appellate case that we have found analyzing a parking problem even somewhat similar to the one at issue here, *Chelsea Neighborhood Associations v. U.S. Postal Service*, 516 F.2d 378, 387–88 (2d Cir. 1975), held that an EIS was inadequate in part because it failed to discuss where 800 residents and 1,500 employees of a planned mixed-use development would park. As explained above, however, Appellees in the instant case provided at least some analysis of the Project's parking impacts and likely mitigating factors.

---

[7] The plaintiffs in *California Coastal Commission* sued under the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*, not NEPA. *Id.* at 1086.

[8] Japanese Village cited *Crenshaw* in its June 20, 2016 Letter of Supplemental Authorities.

We conclude that Appellees' analysis of off-street parking impacts is sufficient to pass muster under NEPA. "NEPA imposes no substantive requirement that mitigation measures actually be taken . . . ." *Robertson*, 490 U.S. at 353 n.16. Appellees estimated the number of parking spaces that could be lost in Little Tokyo due to the Project, but they also estimated the number of spaces that they expect the area to gain from other development. Appellees discussed how increased use of public transit would at least partially offset the need for additional parking. Appellees also discussed possible mitigation measures.[9] The record indicates that Appellees took the requisite "hard look" at the parking impacts of the proposed Project before it was approved.

## IV. BONAVENTURE CLAIMS

Bonaventure argues that Appellees (1) failed to analyze Closed-Face TBM construction as a reasonable alternative tunneling method for the Lower Flower portion of the Project in the FEIS; (2) failed to adequately analyze certain impacts and impermissibly deferred certain mitigation analyses in the FEIS; and (3) failed to prepare a Supplemental EIS to analyze nighttime construction. We address these arguments in turn.

---

[9] Japanese Village claims that Metro declined to adopt a proposed mitigation measure, TR-1, which would provide valet service to people denied access to Japanese Village's parking structure, among other things. As explained in the section above on noise and vibration mitigation measures, Metro actually did adopt mitigation measure TR-1, but this measure was inadvertently left out of the FEIS and ROD. The December 2015 FSEIS corrects this oversight.

### A.  Analysis of Closed-Face TBM on Lower Flower

"The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995)). An "agency must look at every reasonable alternative . . . ," *id.*, but an "agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area,'" *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180–81 (9th Cir. 1990)). For alternatives that are "eliminated from detailed study," agencies must "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a)

### 1.  Feasibility Determination in the FEIS

Appellees addressed Closed-Face TBM in the FEIS, adopting the construction technique for some parts of the Project but rejecting it as infeasible south of 4th Street because of three impediments: (1) the "pocket track" requirement, (2) the requirement to preserve the option of building a 5th and Flower Street station in the future, and (3) the presence of "tiebacks." "[T]echnical determinations of the agency, reflecting the application of its specialized expertise, merit particular deference . . . ." *See Protect Our Cmtys.*, 825 F.3d at 581 (finding that agency reasonably excluded alternative after determining it would present "significant feasibility issues"); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir.

2004) (finding that agency has discretion to reject alternatives deemed ineffective for accomplishing project's goals).

Despite the assessment in the FEIS, Bonaventure argues that Closed-Face TBM was a viable alternative on Lower Flower because the three impediments identified by Appellees had been eliminated *before* issuance of the FEIS. The record, however, does not show that the requirement to preserve the option of building another station in the future had been eliminated or that the issue of tiebacks had been resolved by the time Appellees issued the FEIS. Therefore, we find no basis for concluding that Appellees were arbitrary or capricious in finding that Closed-Face TBM was not feasible on Lower Flower.

### a. Pocket Track Requirement

A "pocket track" is a third track with connecting switches for train storage and passing located between two main tracks and is used to enable quick recovery of the transit system when a train has to be taken out of service. Crossover tracks allow trains traveling in either direction on either track to move to the other track and continue traveling in the same direction without stopping and can be used to allow trains to bypass a stalled train or turn back in the opposite direction. Neither a pocket track nor a crossover track can be constructed using Closed-Face TBM.

Bonaventure argues that Closed-Face TBM became feasible for Lower Flower once the pocket track requirement south of 4th Street was eliminated from the Project in 2011. Appellees contend that although the pocket track requirement was eliminated, it was replaced with a crossover track

requirement, which would similarly preclude use of Closed-Face TBM.

Although the record before us is somewhat ambiguous, it seems that neither a pocket track nor a crossover track was a Project requirement for Lower Flower by the time Appellees issued the FEIS. The DEIS and SEA contemplate a pocket track in the area of Lower Flower. But Metro's April 2012 Draft Tunnel Study states that the pocket track requirement was eliminated in December 2011 because "[c]rossovers in the underground alignment would mitigate service delays and a pocket or storage tracks could be used in adjacent project locations . . . ." The FEIS itself states that a "pocket track, which could also serve as a crossover, would be located beneath Flower Street between 4th and 6th Streets," but also suggests that crossovers and pocket tracks "may not be needed at all of [the listed] locations" and that the Flower Street pocket track "is being considered for relocation as a refinement to the Locally Preferred Alternative."

Assuming that the pocket and/or crossover track requirement had been eliminated or relocated, Appellees may well have violated NEPA if they had relied solely on pocket track incompatibility to find Closed-Face TBM infeasible on Lower Flower. An agency "must look at every reasonable alternative, *with the range dictated by the nature and scope of the proposed action*." *Alaska Wilderness Recreation*, 67 F.3d at 729 (emphasis added) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992)). We need not decide that question, however, because Appellees rejected the Closed-Face TBM as infeasible on Lower Flower for two other reasons—namely, the existence of tiebacks in the area and the Project

requirement to preserve the option of a future Flower/5th/4th Street Station.

### b. *Flower/5th/4th Street Station*

Bonaventure argues that Closed-Face TBM became feasible in October 2010 when the Flower/5th/4th Street station was dropped from the Project plan. This argument ignores that the Project still required preservation of the option to build a *future* Flower/5th/4th Street station. The future station option—rather than the station itself—is Metro's stated reason for rejecting the Closed-Face TBM alternative in the FEIS: "Using tunnel boring machine construction would also create some challenges on the ability of not precluding a 5th and Flower station as the alignment would be changed from a box structure to separate bored tunnels."

Bonaventure suggests that the Project requirement for a future station option was not adopted until April 26, 2012 and was therefore not a legitimate reason to reject Closed-Face TBM as infeasible in January 2012. The April 26, 2012 Metro Board Meeting Minutes cited by Bonaventure list "preserv[ing] the opportunity to install a future station north of 5th and Flower Streets" as an approved amendment to the Locally Preferred Alternative, but the Minutes do not actually show when the amendment was approved. The January 2012 FEIS itself states that "the design of the Locally Preferred Alternative would not preclude a station at 5th and Flower Streets from being built as a possible future, separate project." Therefore, the record does not establish that the requirement to preserve a future station option had been eliminated from the Project before the FEIS was issued.

### c. Tiebacks

Tiebacks are temporary stabilization systems made out of steel that were typically left in place after basement construction in the area. In the DEIS, Appellees note that such "obstructions would potentially be problematic for TBM excavation on Flower Street due to the shallow depths of the tunnels, which is partly why cut and cover construction is planned for this area." In the FEIS, Appellees stated that use of TBM "south of 4th Street would not be practicable due to the need to remove tie-backs ahead of the tunnel boring machine."

Bonaventure's only evidence that Appellees did not consider tiebacks to be an issue is Metro's April 25, 2012 Draft Tunnel Study, which post-dates the FEIS and examines a low-alignment option that Metro developed in response to public comment on the FEIS. The profile of the low-alignment alternative examined in the Draft Tunnel Study "is such that it is assumed to be below all of the existing tie-backs based on available information," but Metro notes that the low alignment option "would generate additional impacts" and "require other project changes."

There is no pre-FEIS evidence to show that Appellees believed that the tiebacks impediment on Lower Flower could be overcome by changing the alignment of the tunnel along Lower Flower. In fact, when Metro studied the issue in 2011, it concluded that it was "not possible to miss the tiebacks with a profile change" because the Lower Flower tunnel segment was "not long enough to permit a tunnel profile with the tunnel grades required to get down under the tiebacks." We affirm the district court's finding that Bonaventure has made no showing of that Appellees were arbitrary and

capricious in rejecting the use of Closed-Face TBM on Lower Flower in the FEIS.

## 2. Effect of Post-FEIS Feasibility Admission

After the FEIS was published, Metro accepted public comment and continued to examine options for extending the use of Closed-Face TBM on Flower south of 4th Street. During a series of community stakeholder meetings in March 2012, Metro discussed the possibility of extending the use of Closed-Face TBM by "deepening the vertical alignment to avoid the 4th Street piling system foundation; resulting in lowering the 2nd/Hope Street Station," and "continu[ing] the TBM configuration from 4th Street to just south of 5th Street, assuming no or minimum tie-back encountered." In a Draft Tunnel Study dated April 25, 2012, Metro stated that it had determined that "it was potentially possible to extend the TBM tunneling to 5th Street, subject to economic feasibility," and had presented the low-alignment option to Metro's Board in March 2012. On April 26, 2012, Metro's Board adopted its staff's recommendation to extend the use of Closed-Face TBM to 5th Street, if it could be done within the Project's budget.

We agree with the district court that Appellees' post-FEIS admission of feasibility does not establish that the FEIS was procedurally deficient.[10] "[T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is . . . limited . . . by the time at which the decision

---

[10] Moreover, we note that Appellees included analysis of Closed-Face TBM at a deep alignment along Lower Flower in the December 2015 FSEIS. Even if Bonaventure's claim had merit, this analysis would likely render Bonaventure's claim moot.

was made." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978). Bonaventure argues that *Vermont Yankee* is distinguishable because it involved a party seeking to reopen agency proceedings that had been closed for over a year, while in this case, Appellees admitted the feasibility of the alternative before the FTA issued its record of decision.[11] We are cognizant, however, that "[a]dministrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated," and if litigants could demand further analysis each time "some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *Id.* at 554–55 (quoting *Interstate Commerce Comm'n v. Jersey City*, 322 U.S. 503, 514 (1944)); *see also Envtl. Def. Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1072 n.19 (8th Cir. 1977) ("[N]ot every addition to the EIS made in response to comments is such as to require a formal supplement to the EIS which must be processed in the same fashion as a new EIS for to do so would make the NEPA review process be one without end.").

The "'touchstone' for courts reviewing challenges to an EIS under NEPA 'is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.'" *Westlands*, 376 F.3d at

---

[11] Bonaventure does not argue—and likely could not establish—that Appellees' post-FEIS resolution to extend the use of Closed-Face TBM on Flower Street (budget permitting) constitutes a "substantial change" requiring a supplemental EIS under 40 C.F.R. § 1502.9(c). Bonaventure only challenges the sufficiency of the analysis in the FEIS.

872 (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)). In this case, the process seems to have worked. Appellees were not required to accept public comments after publishing the FEIS. *See* 40 C.F.R. § 1503.1 (b) ("agency *may* request comments on a final environmental impact statement") (emphasis added). Yet Appellees engaged in continued dialogue with stakeholders and refined the Project in response to community concerns. A finding that Appellees were arbitrary and capricious in determining that Closed-Face TBM was infeasible based solely on Appellees' subsequent admission that they were wrong is unlikely to foster informed decision-making and public participation; rather it is likely to discourage agencies from responding to post-FEIS public comments in the future. *See, e.g.*, *Block*, 690 F.2d at 771 (noting that "[i]f an agency must file a supplemental draft EIS every time any modifications occur, agencies as a practical matter may become hostile to modifying the alternatives to be responsive to earlier public comment").

To the extent Bonaventure argues that Appellees' eventual admission of feasibility establishes that Appellees should have known Closed-Face TBM was technically feasible on Lower Flower all along, the argument is a substantive one and therefore "beyond the scope of our review." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1159 (9th Cir. 1997). As noted by the district court, Bonaventure may have preferred that Appellees reach a different conclusion in the FEIS, but that preference does not establish that Appellees were arbitrary or capricious in determining that the alternative was not feasible.

*B.  Adequacy of Analysis of Project Impacts and Mitigation*

Bonaventure also challenges the sufficiency of the impact analysis in the FEIS. "NEPA 'does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an EIS.'" *Westlands*, 376 F.3d at 865 (quoting *Robertson*, 490 U.S. at 349). "A court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Id.* (quoting *Robertson*, 490 U.S. at 350). Mitigation of environmental impacts must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Carmel-By-The-Sea*, 123 F.3d at 1154 (quoting *Robertson*, 490 U.S. at 353). An EIS, however, "need not contain a 'complete mitigation plan' that is 'actually formulated and adopted.'" *Id.* (quoting *Robertson*, 490 U.S. at 353).

### 1. Grade Separation Impact Analysis

Bonaventure is concerned about the impact of "grade separation" between the concrete decking—which will cover the trench created by cut and cover construction—and existing sidewalk and driveway elevations. Bonaventure argues that Appellees acknowledged the possibility of grade separation in the FEIS, but then failed to quantify the possible extent or analyze the impacts it may have on freeway and garage access. The district court found that the FEIS satisfied NEPA's "hard look" requirement. We affirm.

The FEIS states that decking "may be either flush with the existing street surface, or raised above the street surface with Americans with Disabilities Act (ADA)-compliant ramps to allow continued vehicle and pedestrian access." The FEIS

also responds to public comments about the impacts of grade separation:

- Any decking configurations would require construction of ADA-compliant ramps and accesses as well as modifications to vehicular access points to the garages and driveway along Flower Street

- Any decking configurations would be designed to safely accommodate the undercarriage and overhead clearances of vehicles using the driveways, garages, and loading docks

- Access to and from the bus stop, shuttle area, and mid-block pedestrian crossing would be accommodated in any decking configuration.

NEPA regulations require "only brief discussion of other than significant issues." 40 C.F.R. § 1502.2 (b) ("Impacts shall be discussed in proportion to their significance."). "As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted." *Id.* Because Appellees explained that any "decking configuration" would be designed to avoid significant impacts, we are satisfied that no further discussion is warranted. *See Protect Our Cmtys.*, 825 F.3d at 583 (finding NEPA's "hard look" requirement satisfied where agency "provided less analysis of noise effects in the EIS as compared to other more significant or unmitigable environmental impacts" because agency concluded that noise effects could be effectively reduced).

Bonaventure claims that grade separation may result in severe traffic congestion. Although the FEIS includes extensive traffic impact analysis, the analysis does not touch on grade separation. We find this to be consistent with Appellees' treatment of grade separation as not likely to cause significant impacts; the traffic impact analysis need only contain "a reasonably thorough discussion of the *significant* aspects of the probable environmental consequences." *Carmel-By-The-Sea*, 123 F.3d at 1150 (emphasis added). Bonaventure cites no evidence that grade separation will result in significant traffic impacts; we have no reason to conclude, therefore, that Appellees were required to take a harder look at the issue.

Bonaventure also objects that Appellees violated NEPA by improperly deferring the choice of decking configurations and indicating that environmental factors would not be considered in making the choice: "Decking configurations will be determined during the final design phase of the project, based on cost, schedule, and construction activity phasing considerations." Having determined that there would not be significant environmental impacts from grade separation, Appellees did not act arbitrarily and capriciously in deferring the configuration decision or selecting the listed decision criteria in the FEIS. Moreover, we note that by the time the Project was approved, it included a design refinement stating that "South of 4th Street, construction decking shall be no higher than 10[ inches], if feasible, above the existing grade, and flush with existing curb on the east and west side of Flower Street with a maximum cross gradient of 3%."

## 2. *Emergency Vehicle Access Impact Analysis*

Bonaventure is also concerned about the impact of construction on emergency vehicle access to adjacent properties, including the Westin Bonaventure Hotel. Bonaventure argues that the analysis of such impacts in the FEIS is conclusory and does not explain how the impacts would be mitigated. At first glance, some of the discussion of construction impacts on emergency response in the FEIS appears conclusory. For example, Metro states that it "would not allow construction activities to impede safe evacuation of the buildings or access for emergency personnel at any time." But the FEIS contains further explanation of how such goals would be achieved.

Appellees acknowledge that "[s]treet lane closures associated with construction activities could result in increased response times for emergency services (e.g., police and fire)" and that "[a]ny increase in response times for emergency services would be a potentially adverse construction impact." But the FEIS also discusses mitigation of the impact of street closures:

> Prior to the initiation of localized construction activities, a traffic management and construction mitigation plan shall be devised. The closure schedules in the construction traffic plan shall be coordinated to minimize impacts to residences, business, special events, and traffic flow. . . . [The] plan shall identify, for instance, proposed closure schedule and detour routes, [and] construction traffic routes . . . . Traffic flow shall be maintained, particularly during peak hours, to

the degree feasible. Access to adjacent businesses shall be maintained at all times during business hours, and to residences at all times.

Appellees also indicate that "access to businesses would be maintained during business operating hours throughout construction . . . . Metro would keep entrances and exits clear of obstructions and would ensure that adequate exit routes and safe zones are maintained at all times during construction . . ." Mitigation Measure SS-15 provides that "Metro shall keep sidewalks, entrances to buildings, lobbies, corridors, aisles, doors, or exits that remain in use by the public clear of obstructions." Appellees acknowledge "[i]t may not be possible to keep all vehicular entrances to garages open at all times during operating hours," but state that "Metro would ensure that access is provided via other vehicular entrances during those times as part of its goal to maintain access to businesses. Metro would coordinate with garage owners to ensure safety and minimize inconvenience."

Appellees further explain that Metro would coordinate with emergency services "to provide appropriate safety and security of the public using the Metro system, employees, and the surrounding communities." Appellees state:

> Metro would coordinate construction activities with emergency service personnel to ensure that emergency services and response times are not impacted, as indicated in Section 4.15.4.1[12] of the Draft EIS/EIR. This coordination has been included as mitigation

---

[12] Neither party submitted or cited Section 4.15.4.1 of the DEIS.

> measure number CN-2 in the Mitigation Monitoring and Reporting Program for the Locally Preferred Alternative (Chapter 8 of this Final EIS/EIR).

And Mitigation Measure CN-2 states, "Early notification of traffic disruption shall be given to emergency service providers. Work plans and traffic control measures shall be coordinated with emergency responders to prevent impacts to emergency response times." We are not persuaded that these mitigation measures are insufficient.

Bonaventure argues that these mitigation measures address only pedestrian access, not access for vehicles, but Mitigation Measure TR-1 addresses "[t]raffic circulation disruption" that "would occur during construction." Mitigation Measure SS-15 discusses safety and security measures with respect to "public use of work areas involving sidewalks, entrances to buildings, lobbies, corridors, aisles, stairways, *and vehicular roadways*."

Bonaventure argues that Appellees' promise to maintain access during "business operating hours" is not sufficient because the Westin Bonaventure Hotel operates around the clock. But elsewhere in the FEIS, Appellees note that "Metro would maintain access to the hotel at all times during operating hours . . . ," and specifically explain that "business operating hours" includes operating hours of "late-night business such as the 24-hour gym."

Bonaventure also argues that it is not helpful for Appellees to provide access through "other vehicular entrances" for the Westin Bonaventure Hotel because the hotel's *only* vehicular access is to Flower Street. We note that

Bonaventure does not maintain that the hotel has only a *single* vehicular access point—Bonaventure's statement merely implies that all vehicular access points lead to Flower Street. Bonaventure has not identified any particular impact that would result from this circumstance—Metro could maintain vehicular access to at least one of many Flower Street access points during construction. Even in the unlikely event that hotel has only a single vehicular entrance, nothing in the FEIS suggests that Metro would not maintain access to that entrance at all times—it clearly states that "[a]ccess to adjacent businesses shall be maintained at all times during business hours."

Bonaventure claims that providing early notification to emergency service providers does not address the loss of access caused by the Project. As discussed above, Appellees have explained how they will maintain access for emergency vehicles, albeit potentially more limited access than usual. Early notification to emergency services providers would help to prepare the emergency service providers to navigate the more limited access and thereby mitigate the impact of the Project.

Therefore, we affirm the district court's finding that the FEIS includes reasonably thorough discussion of the impact on access for emergency vehicles.

### 3.  *Deferred Monitoring and Mitigation Measures*

Bonaventure contends that Appellees have impermissibly deferred "myriad studies, surveys and mitigation plans" in violation of NEPA. NEPA requires discussion of "mitigation of reasonably likely impacts at the outset." *S. Fork Band*, 588 F.3d at 727. The district court found that these mitigation

measures were not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. We affirm.

Bonaventure argues that Mitigation Measures GT-1, NV-2, TR-1, CN-3, and NV-13 are too vague because each measure improperly call for measures that "shall" be developed later:

- GT-1: "acceptable threshold values shall be established such that the risk of damage to buildings and utilities will be negligible to very slight."

- NV-2: "vibration monitoring plan shall be developed."

- TR 1: "traffic management and construction mitigation plan shall be devised."

- CN-3: "[t]raffic management and construction mitigation plan shall be developed."

- NV-13: "construction mitigation plan shall prohibit noise levels generated during construction from exceeding the FTA construction noise criteria."

The record shows, however, that in addition to proposing adaptive management plans, Appellees studied baseline conditions and conducted in depth analysis of the subsidence, vibration, traffic management, and noise impacts of the

Project. The FEIS includes lengthy sections describing the impacts on "Geotechnical/Subsurface/Seismic/Hazardous Materials," "Noise and Vibration," and "Transportation."

Furthermore, the challenged mitigation measures themselves describe how the impacts will be monitored and what Appellees intend to do in response:

- GT-1 explains that the subsidence monitoring threshold is tied to "the relationship of building damage to angular distortion and horizontal strain consistent with Boscardin and Cording (1989) and qualitative factors including but limited to the type of structure and its existing condition."

- NV-2 calls for "pre-construction surveys of all buildings within 21 feet of vibration producing construction activity" and states that any damage will be repaired.

- TR-1 describes measures to notify and coordinate with community members in scheduling construction.

- CN-3 states that the traffic management and construction mitigation plans will be developed "in coordination with community" and that "[c]rossing guards and other temporary traffic controls shall be provided . . . as appropriate to maintain traffic flow during construction."

- NV-13 involves monitoring using "FTA construction noise criteria" and listing a variety of mitigation techniques to be used as needed in response to monitoring, including noise barriers, alarms/warning procedures, and mufflers.

As in *Protect Our Communities*, these mitigation measures describe "adaptive management" plans that would provide "flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." 825 F.3d at 582; *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1210–11 (9th Cir. 2004) (finding "hard look" requirement satisfied where FEIS included detailed analysis of traffic concerns and specifically provided "for ongoing traffic monitoring and a 'Traffic Management Plan' to set 'specifications on construction traffic scheduling, proposed haul routes, construction parking, staging area management, visitor safety, detour routes, and speed controls'").

## C. Supplemental EIS for Nighttime Construction

According to Bonaventure, Appellees were required to prepare a supplemental EIS because Metro applied for noise ordinance variances to accommodate nighttime construction on Lower Flower after the issuance of the FEIS. The district court found that no supplemental EIS was required. We affirm.

A supplemental EIS is required if (a) the "agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or (b) there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

40 C.F.R. § 1502.9(c). A supplemental EIS is not required if "(1) the new alternative is a 'minor variation of one of the alternatives discussed in the draft EIS,' and (2) the new alternative is 'qualitatively within the spectrum of alternatives that were discussed in the draft [EIS].'" *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (quoting published guidance from Council for Environmental Quality publications). Like EIS compliance, an agency's decision on whether to supplement is controlled by the "arbitrary and capricious" standard. *See Marsh*, 490 U.S. at 375–76.

Section 41.40 of the Los Angeles Municipal Code prohibits any construction during certain nighttime hours without a permit. On April 16, 2012, Metro applied to the Board of Police Commissioners for nighttime noise variance "to accommodate the construction of necessary utility relocations" along Lower Flower and in several other Project areas. Metro requested permission to work from 9:00 pm to 7:00 am, Monday through Friday, and 6:00 pm to 7:00 am, Saturday through Monday. *Id.* The application indicated that work would start on June 1, 2012 and take approximately 1.5 years. "Understanding that the variance could not be granted for that length of time," Metro requested a six-month permit, indicating that it would request periodic extensions. Metro listed several activities as within the scope of work, such as surveying and traffic control, sawcutting, trenching and shoring, infrastructure installation, backfilling, and paving. Bonaventure argues this application is a substantial change because decking and pouring concrete are the only nighttime activities discussed in the FEIS—not sawcutting, trenching, shoring, or infrastructure installation. Bonaventure also argues that FEIS only contemplated nighttime construction

over short, limited period, while the requested permits would allow for 24/7 construction over 1.5 years.

The Lower Flower variance application does not imply new plans for nighttime construction. The FEIS and DEIS already indicated that utility relocations might require "complex construction sequences and schedules," lasting up to four months on each two-block segment, but that "[s]treet closures would generally be limited to nighttime, weekend, and/or off peak closures and must be authorized by the local jurisdiction." The FEIS notes that the Municipal Code prohibits nighttime construction without a variance and states that the contractor would "be responsible for consistency with the goals of the applicable local ordinance as it applies to all equipment to the job or related to the job." These statements are consistent with the application for a variance for nighttime construction associated with utility relocation that Metro submitted for Lower Flower. Furthermore, the four variance applications in the administrative record all list the same construction activities for the same time period, which suggests that Metro was seeking blanket authorization for utility relocation activities—not that utility relocation would go on continuously for 1.5 years in any one particular area.

Moreover, the FEIS already accounts for the noise and light impacts of possible nighttime construction: "This analysis considered both daytime and nighttime construction activities using the procedures and criteria for a general noise assessment presented in Chapter 12 of the FTA guidance manual (USDOT 2006)." Noise measurements were obtained at the Westin Bonaventure—including 24-hour noise measurements. And mitigation techniques, such as "[h]igher performance mufflers" for nighttime construction "near sensitive land uses" were discussed. The FEIS indicated that

"nighttime lighting would predominantly consist of security lighting, and light would be directed on-site," and therefore would not cause "adverse or significant" impacts. Even if the variance application were to constitute a substantial change in the Project, no Supplemental EIS would be required because the change would not affect the environment "to a significant extent not already considered." *Marsh*, 490 U.S. at 374; *see also Russell Country Sportsmen*, 668 F.3d at 1049 (finding no supplementation required because there was "very little reason to believe the modified travel plan will have environmental impacts that the agency has not already considered").

## V.  CONCLUSION

For the reasons set forth above, the district court's grant of summary judgment in favor of Appellees on all claims is **AFFIRMED**.

**IT IS SO ORDERED.**